KELLER, P.J.,
filed a dissenting opinion.
The habeas court recommends that relief be denied, and I believe that the recommendation is supported by the record. By my reading of the record, (1) there is compelling evidence that applicant is guilty even without considering Janie’s written statement and (2) the polygraph evidence would not have changed the jury’s view of Janie’s testimony.
A. Compelling Evidence
Although some of the evidence that I will recount below was contradicted at trial and on habeas, I believe there is a significant amount of incriminating evidence that creates a compelling case for applicant’s guilt.
1. Relationships
Applicant was not a stranger that happened to be implicated by Mitchell; applicant had significant connections with mem *46 bers of the Victory and Raulston families. Janie, whose polygraph test is the primary subject of applicant’s claims, is Stella Victory’s sister and Aaron, Dalinda, and Jonathon’s aunt. Applicant was Janie’s live-in boyfriend at the time of the murders and the three children knew him. Moreover, applicant “ran with” Kenneth Raulston, and he and Kenneth together “jacked” Mitchell Dickey on a large amount of drugs that Mitchell had fronted out to applicant.
2. Motive
Applicant had at least two motives for killing Johnny Victory. First, on Christmas Eve, Johnny beat up Stella, who was the sister of his (applicant’s) girlfriend Janie. Stella was also the girlfriend of his friend Kenneth. On Christmas Day, there were a “bunch of guys” with “lots of guns” at Stella’s house. Stella’s brothers were there, as was applicant. “They” discussed killing Johnny. Aaron overheard applicant and Kenneth talking about killing Johnny.
Second, Johnny stole cash, barrels of expensive methamphetamine precursors, and counterfeit money plates from Kenneth. Dalinda thought that applicant “had a fuss” with Johnny over the things that came up missing because that’s what she had been told over the years.
3. Eyewitnesses
Several witnesses testified that applicant participated in murdering Johnny and Sarah or that applicant was present when the murders were committed. Mitchell claimed that he, applicant, and Kenneth drove to Johnny and Sarah’s house and parked nearby. Mitchell said he waited in the car while applicant, who carried a shotgun, and Kenneth went to the house. Mitchell soon heard gunshots and ran to the carport, which would have been when Stella’s children saw him. Mitchell testified that applicant and Kenneth killed Johnny and Sarah.
Aaron testified at trial that on the night of the murders, Johnny was carrying him up to the house. When Johnny set him down, Aaron heard a shot and he saw Johnny and Sarah fall. Aaron stopped by his dad, and then ran and hid in the carport. From there, he saw applicant and Kenneth. Applicant and Kenneth each had a gun in his hand.[1]
In 2007, Dalinda gave a written statement about what happened on the night of the murders. In it she says, “I saw a man look through the back living room window. The man had a full beard and collar [length] hair. His hair was black. He had on a red and black checkered coat. I knew Bill Bryant because I had seen him on several different occasions prior to that night. I remember saying to my brothers that the man looking in the window was Bill Bryant or I asked them if it was Bill Bryant. I did think at the time that the man looking in the window was Bill Bryant.”
When Dalinda first testified at trial, she said she did not know if applicant was one of the murderers. The next day, as the judge at the habeas hearing put it, “in dramatic testimony in the rebuttal, as she sat in this witness stand, she turned and pointed at Mr. Bryant identifying him as the killer of one of her parents.” During this later testimony, Dalinda said she was scared, and that she wasn’t even living at home because she was scared for her life and her son’s life. She had always known it was applicant, but her mother, Stella, said it wasn’t him. Dalinda thought it was because Stella was trying to protect them.
*47 Dalinda worked for applicant when she was twenty-two (thirteen years after the murders) and her brothers hated the fact that she was around him all the time. When asked why she was friends with applicant, she said that she couldn’t act like she was scared of him because “what if he would have killed” her if she had shown any kind of fear.
Dalinda testified more than once that she did not know if “it was him,” but she also explained that testimony when she ultimately said that “it was him.” Dalinda testified that she knew in the back of her mind that it was applicant, but she pushed it away. She explained that she always knew it was applicant, but she did not want to believe it because she did not want herself and her kids to be in danger. She said, ‘You have to go through something like that to understand why you would do that. It’s unexplainable.”[2]
Jonathon did not testify at trial, but after the case was reopened, he told law enforcement that there were other people present at the murders, and he believed applicant was one of them. In spite of trying to convince the kids that “it wasn’t him,” Stella later told Jonathon that “it was him.”
4. Weapon
There was evidence that applicant was in possession of a weapon that could have caused the murders. Johnny and Sarah were killed with a shotgun. Johnny had both birdshot and buckshot in his head, which could have been caused by a double-barrel shotgun. Applicant sold two rifles and a double-barrel shotgun to a man in Oklahoma a few months after the murders.
5. Threats / Statements Showing Consciousness of Guilt
Applicant made threats and engaged in conversations after the murder that suggested his own consciousness of guilt. Before the murders, Mitchell had burglarized Kenneth’s house (where Johnny and Stella were living) as part of an insurance scam. After the murders, Mitchell went to prison for the burglary. Mitchell’s mother testified that three or four months after Mitchell went to prison, applicant came to her house in New Mexico with a man named Denny Donaldson and threatened Mitchell’s parents. Applicant told them that they’d better tell “Mitchell, little son of a bitch, to keep his mouth shut.” The reason that Mitchell’s parents had moved to New Mexico in the first place was that, because of an earlier threat, they were afraid for their family. They were told that applicant was going to shoot them.
One time, Dalinda was run over by a flatbed trailer, and applicant came over and picked her up. When he did, he asked if she thought he did it (killed her father), and she said “no.” It was the only time the murders ever came up between them.
, When the capital-murder warrant against applicant was issued and it appeared in the newspaper, applicant left home. United States Marshals were unable to find him at first because he was turning his cell phone ón and off. Applicant also called people to try to find out what they were going to be able to testify about him. One of the people he contacted was' Dalinda. The Uiiited States Marshals were able to trace the call and track applicant to a Days Inn in Paris, Texas, where he was hiding out.
*48 B. Janie’s Statement
After the case was reopened, Janie was interviewed by Special Agent VanderVlugt of the United States Secret Service. Initially, she told him that applicant was home the night of the murders, but after taking a polygraph test and being told she failed, she gave a written statement in which she implicated applicant in the murders. At trial she disavowed the parts of her statement that implicated applicant. In light of the other evidence of applicant’s guilt outlined above, Janie’s recantation of her written statement would not have made any difference, even without the reference to her failing a polygraph test. I do not think that the jury would have believed Janie’s recantation.
Janie’s written statement was witnessed and signed by two law-enforcement officers. She put her initials at the beginning and end of each paragraph and she signed it at the end. I have appended a copy of the statement to this opinion. In comparing this statement with her trial testimony, I do not think it is remotely likely that the jury would have credited her testimony instead of the written statement.
A sheriff, a Texas Ranger, and a Secret Service agent all testified that Janie had said what was in her written statement. They testified that they did not coerce her and that she gave the statement voluntarily. The prosecutor took them line-by-line through the statement and they confirmed that she said each sentence that inculpated applicant.
Janie had nothing to gain by implicating applicant, but plenty to lose. The written statement itself explains why Janie would later recant: “Bill told me that if I ever told anyone that he and Kenneth killed Johnny and Sarah, he would hurt me. I understood this to mean that he would hurt me, my children and my family.” Sheriff Reed said that when Janie was at the Sheriffs office twenty years after the murders, she was still afraid of applicant.
At trial, Janie said that she signed the written statement because she was scared: “There was cops over there.” As to its truthfulness, she said, on the one hand, “A lot of things I said in that statement is not true, because I was scared.”[3] There are a number of statements that she specifically admitted making, but said were not true. On the other hand, she also said about certain things in the statement, “That’s put on that paper, but I didn’t say that right there.”[4] Also, “What was said didn’t get on that piece of paper.”[5] In other words, according to Janie, the officers were able to make her say things that were not true because she was scared, but apparently they could not make her say everything they wanted so they added it themselves.
In order for the polygraph evidence to have changed the outcome of this trial, it would have had to move the jury from a level of confidence less than “beyond a reasonable doubt” to “beyond a reasonable doubt.” I believe that the jury would have credited the written statement instead of Janie’s testimony even if the polygraph evidence had not been introduced. In light of the lack of credibility of her trial testimony and in view of the other evidence of applicant’s guilt, I do not believe that applicant has met his burden to show that he is entitled to relief.
C. Why Didn’t The Children Speak Up Earlier?
They were scared of applicant. Mitchell was a criminal. Kenneth was a violent *49 man who was involved in manufacturing methamphetamine, counterfeiting money, and setting up an insurance scam. Johnny was himself extremely violent and was also involved in stealing drug precursors, counterfeit plates, and money. Nevertheless, the children promptly implicated Kenneth and Mitchell. This is why: Applicant wanted to kill them; Kenneth didn’t. Mitchell testified at trial that it was his impression that applicant wanted to kill them and Kenneth saved their lives. At the scene of the murders, Kenneth and applicant were arguing behind one of the children, and Kenneth was telling the kids to get into the house. Even after the three men left the house and went back to the car, Kenneth and applicant were arguing. about the kids. Applicant wanted to go back and kill them because they had witnessed the murders, and Kenneth wanted to leave them alone. Applicant was the only one the children felt threatened by, so he was the only one whose identity they hid.[6]
Moreover, at least one of them did speak up earlier, although not to the authorities. Aaron told his Aunt Pat-Johnny’s sister- and he told his psychiatrist.
Finally, like Janie, Aaron and Dalinda had no motive to falsely accuse applicant and nothing to gain by doing so. If anything, Dalinda had a reason not to falsely accuse him because he had given her a job when she needed one.
D. Conclusion
It took over twenty years to get the witnesses against applicant to come forward and testify against him. Janie, Da-linda, Mitchell, and Mitchell’s parents were afraid of him because he killed Johnny and Sarah, threatened to kill the children, threatened to kill Janie and her family, and threatened to kill Mitchell and his parents. They are still afraid of him.
The Court says that the record supports the conclusion that applicant has established prejudice, but because the habeas court recommended denying relief, the record should be viewed in the light most favorable to that recommendation. While there is evidence in this case that would support a recommendation to grant relief, there is more than enough evidence to support a recommendation to deny relief. The habeas judge was also the trial judge, and it is obvious from the record that he remembers the trial testimony vividly. I would deny relief.
I respectfully dissent.
Attachment
*50 [[Image here]]
*51 [[Image here]]
*52 [[Image here]]
*53 [[Image here]]
*54 [[Image here]]
*55 [[Image here]]
*56 [[Image here]]
*57 [[Image here]]
*58 [[Image here]]
*59 [[Image here]]
*60 [[Image here]]
*61 [[Image here]]
*62 [[Image here]]

. I have appended to this opinion Aaron’s testimony on direct examination.

. Dalinda remembered that Janie called applicant "Tom” because he was seeing another girl behind her back.

. Emphasis added.

. Emphasis added.

.Emphasis added.

. Aaron had another reason to keep quiet when he got older. When the case was reopened, the sheriff went to the prison where Aaron was incarcerated. Even though Aaron did not feel safe talking to them—and did not talk to him—he was assaulted the next day by members of the Aryan Brotherhood for possibly talking to the sheriff about the murders. After the trial, Aaron went into protective custody, where he spends only one hour a day out of his cell.